# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

**FILED**
SEP 28 2012
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

—oOo—

UNITED STATES OF AMERICA
v.
ALAN DAVID TIKAL

**CRIMINAL COMPLAINT**

CASE NUMBER:

2:12 - MJ - 246 CKD

(Name and Address of Defendant)

I, the undersigned complainant state that the following is true and correct to the best of my knowledge and belief. On or about **January 7, 2010, through September 27, 2012** in **Sacramento** County, in the Eastern District of California, and elsewhere, defendant did,

▸ **Devise a scheme or artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises,**

in violation of Title **18**, United States Code, Section **1341**. I further state that I am a Special Agent with the Special Inspector General, Troubled Asset Relief Program (SIGTARP) and that this complaint is based on the following facts:

▸ **See Attached Affidavit**

Continued on the attached sheet and made a part of this complaint:  **X**

Signature of Complainant    Joseph Camillucci
Special Agent, SIGTARP

Sworn to before me, and signed in my presence
September 27, 2012                at    Sacramento, California

Date                                       City        State

Hon. Carolyn Delaney       U.S. Magistrate

Name of Judge              Title of Judge      Signature of Judge

**AFFIDAVIT IN SUPPORT OF**
**APPLICATION FOR COMPLAINT AND ARREST WARRANT**

I, Joseph Camillucci, being first duly sworn, hereby depose and state as follows:

**A. Introduction and Agent Background**

1. I write this affidavit in support of a complaint and a request that an arrest warrant issue for Alan David Tikal, of Brentwood, California, for violating 18 U.S.C. Section 1341 (Mail Fraud). As set forth below, Tikal and his associates are responsible for an ongoing scheme to defraud whereby they extract fees and monthly payments from victim homeowners through false and fraudulent promises to pay off existing mortgage debts, and replace them with loans worth only one-quarter of what the homeowners currently owe. In fact, Tikal does nothing to satisfy the victims' existing obligations, and he and his associates simply pocket the victims' payments.

2. I am a Special Agent with the Special Inspector General for the Troubled Asset Relief Program (SIGTARP), and have been so employed since June of 2010. SIGTARP was created by Section 121 of the Emergency Economic Stabilization Act of 2008 (EESA). SIGTARP has the responsibility, among other things, to conduct, supervise, and coordinate investigations of the purchase, management and sale of assets under the Troubled Asset Relief Program.

3. Prior to my employment with SIGTARP, I was a Special Agent with the Internal Revenue Service, Criminal Investigations (IRS-CI). I was in that position beginning in September of 1987, for approximately 23 years before joining SIGTARP. In that capacity, I was responsible for the investigation of potential violations of the Internal Revenue Code and related matters. I have participated in hundreds of investigations involving Income Tax, Money Laundering, Mail Fraud, Wire Fraud, and other related violations.

4. I received a Bachelor of Science degree in Business Administration with an emphasis in Accounting, and have extensive training in Law Enforcement related legal matters. I am also a Certified Fraud Examiner, certified by the Association of Certified Fraud Examiners.

5.  This affidavit is based on information I have obtained during this investigation and information from other law enforcement agents such as Mark Weber, a Special Agent with IRS-CI. I have not included all the information known to myself or the other investigating agents because I am only attempting to establish probable cause to support the issuance of the aforementioned complaint and arrest warrant.

### B.  Summary of Probable Cause

6. As set forth below, my investigation has discovered evidence establishing probable cause to believe that beginning in January of 2010, and continuing through the present, Alan David Tikal and his associates have operated a large-scale mortgage rescue fraud scam throughout California and other states. Tikal operates through an entity called the KATN ("Kicking Ass and Taking Names") Trust. Tikal and his recruiters tell homeowners that he is a "private, registered banker" who has the ability to reduce the outstanding principal on their home loans by 75%. His explanations as to how he accomplishes this are sometimes inconsistent, but at bottom he promises to extinguish a homeowner's existing debt, and replace it with a new "loan," payable to Tikal (or associated entities), in an amount that equals 25% of the homeowner's original obligation. Participants are required to pay initial upfront fees, and then regular payments on their new loans. They are also counseled to ignore the demands for payment by the original lenders whose claims are purportedly contrary to law. Towards the latter half of this scheme, Tikal has utilized filings with the United States Bankruptcy Court to forestall foreclosures and encourage continuing client payments. In fact, Tikal does not, and cannot, purchase, assume or otherwise extinguish the homeowners' existing mortgages. The result is that participants make payments to Tikal, instead of the financial institutions holding the deeds to their homes, or attempting loan modifications through programs such as the Home Affordable Modification Program (HAMP). Tikal and his associates are enriched, and the homeowners fall behind or default on their mortgage loans.

7. Over the course of this investigation, I (and my colleagues) have participated in the execution of a search warrant at Tikal's residence where, among other things, we recovered hundreds of client files relating to the scheme.

I have participated in, and reviewed reports of, interviews with Tikal's associates and many of his client/victims. I have reviewed financial records showing the deposit of client monies into accounts controlled by Tikal and his associates. I have reviewed recordings of statements made by Tikal to prospective clients and recruiters in which he both describes his "program" and makes false and fraudulent claims regarding his success rate. I have reviewed bankruptcy filings submitted on behalf of Tikal in which he lists hundreds of "loans" purportedly owed to him by clients as assets, and the actual mortgages owed by those clients as liabilities. Finally, I have reviewed documents sent to and from the victim homeowners through the United States Mail in furtherance of Tikal's scheme. As set forth below, this evidence shows that Tikal has victimized over 1,000 homeowners, who have paid out in excess of $3.1 million dollars. Of the identified victim homeowners, approximately 185 reside within the Eastern District of California.

## C.  Probable Cause

### 1. The KATN Program

8.   Over the course of this investigation, I have interviewed and read the reports of interviews of multiple persons who participated in Alan Tikal's program. Although the majority of these participants did not have a clear understanding of how the program worked, almost all of them had the same understanding of the program's bottom line – when the program was completed they would only owe 25% of what they currently owed on their home mortgage loans. Thus, as stated by Mr. and Mrs. A.L. of Stockton, California, Tikal said he or his investors could purchase a participant's home and sell it back to them for 25% of their current loan amount. Similarly, Maria M. of Fairfield, California, said she was told Alan Tikal could pay for her house, and she would then pay him 25% of the current loan. Carol T., of Sacramento, California, understood that the process was some sort of refinance in which her original debt would be "absolutely" gone, and replaced with a KATN debt that was 75% less than what she currently owed.

9.   The majority of the program participants interviewed by law enforcement never met Tikal in person. Instead, the participants generally interacted with recruiters who

worked throughout California for Tikal and who received a percentage of the fees paid by each participant. One of Tikal's primary recruiters during the early part of the scheme was Javier Ordonez. Ordonez, who described himself as Tikal's "right hand man," was interviewed by law enforcement on January 24, 2011.

10. According to Ordonez, Tikal explained that his program was called "Acceptance For Value." Tikal told Ordonez that he himself was a banker and that he had a bank in Switzerland supporting him. Tikal explained that banks do not work with real money, and instead, they pay debt with debt. Tikal claimed he had billions of dollars in a bond with the Treasury Department that allowed him to pay debt with debt.

11. Ordonez explained that he was hired by Tikal to refer people into the program. He said he solicited people into the program,[1] and these people in turn solicited others. Ordonez said he explained to these people that they would not be paid much, and that Tikal "would be making the majority of the money."

12. Although Tikal's program changed over time, through interviews of recruiters and participants, and review of documents seized, I have learned that the program generally involved three steps. As described by Ordonez, the first stage involved the collection of an initial fee of $1,000[2] and information relating to the participant's current mortgage. I know from interviewing others and reviewing seized documents that this information included the identity of the financial institution, the loan number, and the property address, among other things. Ordonez said the initial fee was deposited into his bank account. At Tikal's urging, he opened an account in the name of Sherwood Archer,[3] LLC, because clients were suspicious of the fact that deposits were being made into personal accounts.

13. Ordonez said that following the receipt of the

---

[1] It should be noted that Ordonez claimed to have only brought six people into the program. Based upon my knowledge of this case, it appears Ordonez was minimizing his involvement on this point.
[2] I know from interviews with various witnesses that the initial fee could vary upward from $1,000 as high as $2,500.
[3] Ordonez chose the name Sherwood with reference to Sherwood Forest, because "We started calling him (Tikal) Robin Hood."

mortgage information, a series of letters were sent to the financial institutions holding the notes on the participants' homes. Ordonez said these letters included "some information about . . . UCC laws." Ordonez said that after a third letter was sent to the banks, the loan was "cured," meaning the debt had been paid in full. I have reviewed these letters and none of them appear to include or reference any legitimate form of payment.

14. After the "curing," the second stage in the process involves the signing and recording of a number of documents, including a "Substitution of Trustee and Full Reconveyance" and a new "Deed of Trust." The Substitution of Trustee document substitutes Tikal for the original financial institution as trustee for the mortgage. That purportedly gives Tikal the right to reconvey the mortgage. The new deed of trust purports to secure the KATN "loan" with the homeowner's property. At this point, fees referred to as "Closing Costs" were collected from clients. I know from witness interviews and review of bank records that these costs were generally between $1,000-$1,200 per property. As set forth below, for a period of time, an entity called Caring About America ("CAA") collected and deposited these fees.

15. Finally, after the documents were recorded, participants would receive documents relating to their new loan. They were mailed payment coupons and expected to make monthly payments on their "loans." When asked about the source of the money for the new loans, Ordonez said there was no source of money. He said Tikal explained the new loans were debt that participants would incur paying him back in exchange for clearing the debt. Ordonez claimed to have confronted Tikal with the fact that these were not actually loans. He said Tikal did not know what term to use to describe these payments.

16. Ordonez claimed to have quit working with Tikal on or about July 6, 2010. Asked why, he said there were no results, meaning the properties were not paid off and the banks continued to pursue the participants for payments.

17. As stated, homeowners generally interacted with recruiters who worked throughout California for Tikal. However, Tikal explained his message to recruiters and homeowner participants through a variety of mass communication means. He participated in regular conference

calls and webinars, and occasionally appeared at
conferences held at hotels. I have obtained and reviewed
recordings of Tikal's statements during some of these
appearances.

18. For example, I have obtained a copy of a recording of
a conference call held on February 12, 2010, in which Tikal
explained his program to potential recruiters and homeowner
participants. I have listened to the recording and
reviewed a transcript of it. On that recording, Tikal
explained who he was and what he was offering:

> I am a registered private banker in accordance
> with all federal regulations and laws governing
> the banking industry.[4]. . . I pay the existing
> debt against your property regardless of its
> current value. If your home is way upside down,
> a hundred thousand dollars, two hundred thousand
> dollars upside down I'm not worried about that.
> I will pay off all of the existing debts and
> liens against your home. And then the fees - the
> 25% on the back end is tied only to the amount of
> debt.

19. Later during this recording, Tikal gives an
explanation as to how the program works:

> I as a registered private banker, have access to
> an enormous line of credit in the banking
> industry that all banks do.[5] My signature and my
> stamp and my seal on your mortgage statement pays
> that mortgage in full. Then the mortgage
> statement is submitted to the United States
> Treasury as well as back to your bank that has
> your mortgage. And from there the appropriate
> debits and credits are done. The end result is

---

[4] I am not certain of what Tikal means by "registered private banker."
I do know that on July 7, 2010, the Office of the Comptroller of the
Currency ("OCC"), a department of the United States Treasury, issued a
notice to various public banking authorities in which it stated that
"Mr. Tikal is not a registered private banker with the U.S. Department
of the Treasury."

[5] At another point in the recording, Tikal explains, "every large nat-
federally chartered bank has what's known as a TTL account. A
Treasury, Tax and Loan Account. . . .I have a Treasury TTL account.
And what happens when I send a banker's acceptance in for $400,000 to
let's say Bank of America, I am debited $400,000 from my TTL account
and Bank of America is credited $400,000 from my TTL. . . ."

your home is free and clear.[6]

20. During that same conference call, Tikal claimed to have extraordinary success rates, stating "In the past quarter - in the past four months I've closed 42 of 44 deals." He also acknowledged that the participants' original home lenders were not likely to react positively to the fact that participants would stop making loan payments. He said that while there was "[a]bsolutely zero danger of being sued by the bank," participants should anticipate that "the banks are going to write you nasty letters." He told participants he wanted them "to expect this." He also assured them "there is no fraud," and "[t]he IRS, the Department of Treasury and The Office of the Controller of the Currency all" were aware of what he was doing. As he put it, "the IRS is essentially the bookkeeper."[7]

21. As another example, participant C.T. participated in and made audio recordings of a number of webinars that featured Tikal and/or his recruiters. I have reviewed many of these and arranged for the preparation of transcripts. At a webinar held on October 2, 2010, Tikal again made claims regarding the success of the program. Specifically, he said he had recently learned that "in the past couple of weeks" his team had saved "another 25 million dollars' worth of properties" from foreclosure. Later in the recording, he asserts, "if we get the process and the paperwork done before the Trustee's sale, our success rate is 100%" and that "we have done nearly a thousand of these."[8]

22. During this same webinar, Tikal again references the

---

[6] At another point in the recording, Tikal claims "this program has been around since 1935" and was the result of a "compromise between the Chairman of the House Banking Committee in 1935 and the Chairman of the Federal Reserve Board, the Secretary of the Treasury."

[7] In fact, in the notice referred to above, the OCC said it had not "scrutinized and monitored" Tikal's program, as apparently represented on a website referenced in the notice. (I have not been able to review the website referenced, www.mprprogram.com, as it no longer appears to be in operation.) The notice added that based upon OCC's review of the program as described on the website, it "does not appear to be a legitimate program," adding, "[a]ny group, individual, or company that states that they can eliminate a person's debt for a fee and without providing sufficient funds to pay off the debt in its entirety is perpetrating a fraud."

[8] At another point in the webinar, Tikal states, "if we've got 90 days' worth of possession left, we will save their home, 100% of the time."

negative reaction that clients experience from their prior lenders. He states:

> Every single client will get the letter saying, "you can't do that," or, "this is fraudulent." You notice they won't send those letters to me. They know better. And the banks will learn that if they want to accuse me of fraud to my face, it's going to go badly for them. . . . Expect your people to get scared. Expect your people to get nasty letters. And when they do, realize this, it's a sign that the banks are running scared.

### 2. Tikal's Bankruptcy Filing

23. In the summer of 2011 Tikal's scheme began to incorporate the use of the bankruptcy courts in an apparent effort to stall foreclosures and to stimulate continued victim payments. I have reviewed documents filed with the United States Bankruptcy Court for the District of Nevada, and I have interviewed Ed McDonald, a bankruptcy trustee for the District of Nevada. I have learned that on or about June 20, 2011, Tikal filed (or arranged for the filing of) a Chapter 11 bankruptcy petition for the KATN Living Trust. That petition was subsequently dismissed, but on August 25, 2011, Tikal arranged for the filing of a Chapter 11 personal bankruptcy petition in his own name. I have reviewed that petition, in which Tikal claims to have no income and no assets.[9] However, in one of the attached schedules, he lists as accounts receivable the names and addresses of approximately 450 KATN clients. As potential liabilities in an amount exceeding $79 million dollars, he identifies the financial institutions holding the original loans on properties owned by these clients.

24. On October 13, 2011, Tikal participated in a Section 341 Creditors Meeting. He did so over the telephone, as he was then incarcerated in the Santa Rita Jail in Alameda County on pending state charges.[10] He was sworn to tell the

---

[9] Tikal subsequently filed amended schedules in which he listed minimal income and expenses.

[10] On February 2, 2011, Tikal and three others were charged in a 30 Count Indictment issuing from the County of Alameda in Case No. 165379. Tikal was charged with Conspiracy to Defraud in violation of Cal. Penal Code § 182(a)(4), Mortgage Securities Fraud in violation of Cal. Civil Code § 2945.4, Offering False or Forged Instrument in violation of Cal Penal Code § 115(a), and Grand Theft of Personal Property in violation

truth and questioned by Trustee McDonald, and a transcript of his testimony was prepared. I have received and reviewed a copy of that transcript.

25. Tikal stated he had only received negligible income over the two preceding years. He said he had no real estate, no cars, no cash, and no checking, savings or other financial accounts.

26. Tikal said KATN Trust was his corporation, and that it "was in the business of trying to save people's homes." Tikal was asked if he actually helped anybody save their homes and he responded affirmatively. When asked how many people he had helped, Tikal responded, "I don't recall off the top of my head, but there was one time where we got a letter back from Wells Fargo acknowledging payment and validity."

27. When asked why he had filed his bankruptcy petition, Tikal said "it was my desire to bring everything in front of a federal bankruptcy judge to simply say this is what I've done. This is why I believe what I've done is valid." However, when asked repeatedly what it was he had done in terms of the operation of KATN and its program, Tikal refused to answer on Fifth Amendment grounds. Tikal was informed that Chapter 11 referred to reorganization bankruptcy and he was asked how he was going to reorganize. He responded, "my intention . . . when I was first arrested, I have and had leads on financing that would allow me to pay off everything on Schedule F so that there would not be any potential liabilities out there." The trustee confirmed that Tikal was stating he was planning on getting $80 million in a hard money loan from an individual. Tikal said he was, however, he could not remember the individual's name and had only met him once, the previous summer in New York City, for about 15 seconds.

28. I know that from interviewing personnel with the Bankruptcy Court, and from reviewing the docket in Tikal's bankruptcy case, that the filing has been successful in

---

of Cal. Penal Code § 487(a). These charges related to 11 homeowners in Alameda County. Tikal was arrested in Las Vegas in February of 2011 and remained in custody pending resolution of his case. On October 31, 2011, Tikal pled "no contest" and was found guilty of count 9, a violation of Cal. Penal Code § 115, and count 3, a violation of Cal. Civil Code § 2945.4. He was released from custody on or about November 1, 2011 and was later sentenced to time served.

delaying foreclosure actions by financial institutions against multiple KATN clients whose properties are listed in Tikal's petition.

### 3. Evidence of the Scheme At Tikal's Residence

29. On December 7, 2011, I participated in the execution of a Search Warrant[11] at the residence shared by Tikal and his wife, Tamara Silva, at 902 Meyers Court in Brentwood, California. Therein, we found and seized a considerable volume of evidence relating to the scheme. For example, in the garage of the residence, we found numerous KATN Trust client files - enough to subsequently fill thirteen banker's boxes. These consisted of manila folders with the client's name on the outside. Within each folder were copies of various program documents relating to each client.

30. We also recovered a large volume of evidence relating to correspondence Tikal had with financial institutions, purportedly for the purpose of "curing" his clients' loans. These included a large volume of certified mail receipts establishing mailings to the financial institutions. It also consisted of a very large volume of correspondence from various financial institutions, apparently sent in response to these mailings. I use the word apparently because, interestingly, the majority of these mailings were unopened.

### 4. Analysis of Financial Records

31. The investigation to date has obtained records of 63 bank accounts relative to KATN Trust, KATN's associates, and related marketing companies. Analysis of these accounts has allowed me to make approximate determinations regarding the identity and number of participants in the program, the total amount of deposits made pursuant to this program, and the disposition of these deposits.

32. I know from participant interviews, as well as analysis of the bank records, that participants made payments in a variety of forms, including cash deposits, personal checks, cashier checks, and money orders. Generally, I am unable to determine which victims have made cash deposits, and in many if not most cases, I am

---

[11] The search warrant was signed by U.S. Magistrate Judge Laurel Beeler of the Northern District of California, and given case No. 4-11-71346.

similarly unable to tie cashier checks and money orders to particular victims. However, I have been able to do so with respect to personal checks and some cashier checks and money orders. I have segregated these identifiable deposits into a spreadsheet. Analyzing that data, I have been able to identify over $3.1 million in participant deposits coming from approximately 1,215 victims.[12]

33. In conjunction with what I have learned through witness interviews, I have been able to roughly segregate the deposits into the various accounts according to the types of victim payments made into those accounts. These consist of initial program fees, "closing" costs, and monthly "loan" payments. As described more thoroughly below, I have been able to identify the following approximate deposits with respect to each type of payment: Initial Fees - $3.5 million; Closing Costs - $500,000; and Monthly Payments - $1.1 million. Thus, it appears that the records I have reviewed (which are current through April of 2012) show total participant deposits of approximately $5 million dollars.[13] Of this, approximately $1.8 million made its way into accounts controlled or accessed by Tikal (including accounts in the name of KATN, Silva, and/or Silva's mother, Sheila Eisenhuth).

34. Of note, despite Tikal's various assertions that he would pay off participants' existing mortgages, and despite his issuance of new "loans" to participants, I see no evidence in the records of any payments to financial institutions to pay off any participant obligations. Indeed, I have inquired of the five financial institutions which appeared to have handled the largest number of KATN client loans, and I have learned that the majority of these properties are either in currently in or have completed foreclosure proceedings.

       **a.  Initial Fees**

35. As stated above, when participants first joined the

---

[12] By victim, I am referring to a particular property that is participating in the program. Some participants involved more than one property in the program. In that instance, I counted each property as a separate "victim." Similarly, sometimes more than one person (for example, a husband and wife) made payments with respect to the same property. In that circumstance, I counted only a single "victim."
[13] This figure exceeds what I can tie to identifiable participants because, as stated, many payments were made in cash or some other non-identifying format.

program, they were required to pay fees ranging between $1,000 and $2,500. Generally these payments were first deposited into accounts associated with the recruiters dealing with the participants. Thus, I analyzed the personal bank accounts of recruiter Javier Ordonez and his wife Nora Melendez-Lebron, as well as the account opened by Ordonez in the name of Sherwood Archer, LLC. After accounting for transfers and payments from various non-participant persons and entities, it appears that approximately $500,000 in initial fees was deposited into these accounts. Further analysis shows that over $300,000 of these funds were forwarded to KATN and/or accounts associated with Tikal.

36. Similarly, I analyzed two bank accounts associated with recruiter Jose Castellanos and opened in the name of Walgreen Partners, LLC. After accounting for various transfers and payments from non-participants, it appears that approximately $190,000 in initial fees was deposited into these accounts. Of that, more than approximately $95,000 was forwarded to KATN and/or accounts associated with Tikal.

37. I analyzed two bank accounts associated with recruiter Brandon Le. One was opened in the name of Biosphere Alternatives, LLC, and the second was in the name of KATN Fundings, LLC. After accounting for various payments and transfers from non-participants, it appears that more than $1.3 million dollars in initial fees was deposited into these accounts. Of that, more than $400,000 was forwarded to KATN and/or accounts associated with Tikal.[14]

38. Finally, I reviewed an account in the name of Lamar Equities, controlled by Luis Macias, another KATN Trust recruiter. There is over $900,000 in deposits into this account, and it appears that the majority of those deposits are homeowner payments. It should be noted that this account appears to have held initial fee deposits, and also payments purportedly submitted for the filing of Quiet Title actions. I know from multiple witness interviews that Tikal offered victims quiet title actions as a means of declaring who actually held title to the properties. Although Tikal would at various times announce victories in

---

[14] It should be noted that many of these accounts also showed large numbers of cash withdrawals. For example, more than $415,000 was withdrawn in cash from the Biosphere Alternative and KATN Funding, LLC accounts referenced above.

unidentified quiet title actions, I am not aware of any. Indeed, by recording bogus deeds of trust and other documents, Tikal's program merely further encumbered the homeowners' properties.

### b. "Closing" Costs

39. I have reviewed records for an account opened in the name of CAA, Inc. This account was open from August of 2010 through September of 2011. Based upon my understanding of CAA's role in the program, and my review of the amounts of deposits into this account, I believe this account was used to receive "Closing" Costs. As stated above, these were the payments that participants were required to make after being informed their loan(s) were "cured" so that KATN could take the next step of recording various documents concerning the property and the new "loan." It appears that approximately $460,000 in victim "closing" costs was deposited into this account.

### c. Monthly "Loan" Payments

40. As discussed above, homeowners were expected to make monthly loan payments to KATN, or its designees, as opposed to the financial institution that actually owned the loan on the participants' residences. Over the course of the scheme, these payments were deposited into a succession of bank accounts.

41. According to Brian Jones,[15] from August of 2010, through January of 2011, monthly loan payments were received by CAA and deposited into a specific CAA account. I have reviewed that account and it appears that approximately $395,000 in monthly loan payments were deposited into it.

42. According to bank records, beginning in March of 2011, and continuing through August of 2011, monthly loan payments were deposited into two accounts in the name of "Learn 2 Break Free." The signers on these accounts were Silva and her mother. I have reviewed these accounts, and it appears that loan payments of approximately $330,000 were deposited into them. These accounts were closed at the end of August of 2011. According to Eisenhuth, monthly loan payments were deposited into a Bank of Nevada Learn 2

---

[15] Brian Jones is the son of CAA's president, David Jones. He assisted his father in the operation of CAA.

Break Free account from October through December of 2011. In all, it appears approximately $90,000 in monthly payments were deposited into this account.

43. My investigation has revealed that as of December 2011, an individual named Jay Stein became involved in the processing of monthly payments. On August 16, 2012, I interviewed Stein and determined that from December of 2011, through the present, monthly payments were deposited into US Bank accounts controlled by Stein. I have reviewed these accounts through August of 2012, and it appears that in excess of $500,000 was deposited into these accounts. I have been able to review records relating to an account held in the name of Sheila Eisenhuth. Those records show regular deposits totaling approximately $200,000 from these Stein accounts. On that basis, I believe the scheme continues and Tikal continues to benefit from it.

### 5. Mailings In Furtherance Of The Scheme

44. After homeowners became part of the program, they typically received a welcome letter including payment coupons to use in submitting payments on their new "loan." As an example, I reviewed the documents sent to homeowner L.R. of Vallejo, California, on or about November 1, 2010. The letter purports to come from "The Entire Caring About America Family," and states that CAA has "been hired by the KATN Revocable Living Trust to be the loan servicing company on your new mortgage with them." Each payment coupon includes an address window for CAA with a PO Box address in Henderson, Nevada. Each coupon also sets forth the loan number and purported payment due. The welcome letter was also accompanied by return envelopes for use in submitting payments.

45. On or about May 18, 2011, multiple victim homeowners received two letters. I have reviewed copies of these letters, including the copies sent to K.B. in Menifee, California. One letter purported to be from KATN Customer Service. It acknowledged the receipt of "many requests from clients to protect their properties from foreclosures and evictions." It stated that, in response, KATN would be filing for bankruptcy protection. It continued, "By filing for bankruptcy, we can continue the fight in bankruptcy court while keeping your property protected until the judge comes to the final decision of who has title rights to your property." The second letter came from a Nevada attorney

purporting to represent KATN. The letter referenced the coming bankruptcy filing and reminded homeowners that they were "presently under contract to pay the KATN Trust money pursuant to a promissory note." The letter warned victims that if they failed to make their monthly payments, "the KATN Trust will notify the bankruptcy court of your failure, and the KATN Trust will then proceed to exercise all available remedies against you."

46. On or about June 16, 2012, multiple victim homeowners received a "KATN CLIENT UPDATE" via the United States mail. I have reviewed multiple copies of this correspondence, including the copy sent to victim H.R. in Vallejo, California. The update is on KATN Trust letter head and purports to be written by Tikal. In it, he announces that "KATN secured its' first quiet title ruling against the banks" which he claims "is an unambiguous statement that everything KATN has done is in fact COMPLETELY LEGAL and legitimate." He promises to work on "getting everyone else's homes on the docket" for additional quiet title rulings, claiming "the fight" is "a moral imperative" and that "Debt itself is a human rights issue to me." However, he also mentions the "enormous" cost of litigation, and says he "will not fight to defend non-performing assets." He states, "Put simply, if you want me to get this quiet title on your property, keep making your monthly payments." The update concludes, "God Bless, Alan Tikal:AL."

47. On or about September 6, 2012, multiple victim homeowners received another update letter from Tikal through the United States mail. Again, I have reviewed copies of this correspondence, including the copy received by J.M. of Corona, California. The letter is on KATN Trust letter head and is apparently signed by Tikal. In it, he states that the "KATN bankruptcy is to be extended to March 2013." He says he "hope(s) the extended bankruptcy protection helps with your peace of mind." He then announces a "radical change in our procedure" which will result in "an imminent solution to your mortgage problems." He says "KATN will begin servicing all of our client's mortgage debts directly" and will "make back payments to your previous lender to bring the mortgage current." He announces, "[t]he fight with your previous lenders shortly, will be over." He then attaches an authorization form purporting to give KATN the authority to negotiate and make payments on behalf of each homeowner. He asks that the form be filled out and e-mailed to KATN.

### D.  Evidence That Tikal is a Flight Risk

48.  This investigation has led to evidence indicating that, once apprised of these charges, there is a strong possibility Tikal will attempt to flee. He is only recently a resident of California, he has limited ties to this state and he has no known legitimate employment. Over the course of this investigation, he has traveled extensively across the United States, and has made at least one trip overseas to the United Kingdom and the Ukraine. He has established contacts within the Ukraine. Moreover, in my analysis of the bank records in this case, there has been $800,000 in cash withdrawals from accounts controlled or accessed by Tikal. I do not know where this money ended up, and it may well be that Tikal has access to it. Finally, I know that as recently as September 10, 2012, Tikal contacted a private charter flight company and attempted to set up an escrow account for use in financing future international travel.

49.  According to public database searches, Tikal has resided in numerous states over the years. It appears that at the start of this scheme, Tikal was residing in Anoka, Minnesota. Subsequently, I confirmed that he resided in Las Vegas, Nevada (indeed, this was the location of his arrest on the Alameda County charges). Following his release from Alameda County jail, Tikal took up residence in Brentwood, California. It should be noted that there is apparently an outstanding warrant for Tikal's arrest, issued on August 2, 2011, from Andover, Minnesota, with respect to a receipt of stolen property charge.[16]

50.  As stated above, Tikal testified under oath in his bankruptcy proceeding that he had no employment or assets of any kind that were not somehow connected to KATN. In addition, I have been unable to locate any assets or financial accounts held in his name. I am unaware of any gainful employment held by Tikal.

51.  Analysis of bank records shows that Tikal made regular payments to a company called "Anastasia International." I have learned that Anastasia International is an international dating site featuring Ukrainian women. I

---

[16] It is my understanding that contact was made with authorities in Minnesota while Tikal's Alameda County case was pending, and Minnesota was apparently unwilling to extradite from a non-adjacent state.

have received and reviewed records from this company showing that Tikal frequently corresponded with numerous women through this website. Moreover, I have confirmed that in December of 2010, Tikal flew from the United States to the United Kingdom. On December 14, 2010, Tikal paid over $25,000 to a company called Jets.com to arrange a private flight from the United Kingdom to the Ukraine, and returned the next day.

52. According to Jets.com, on September 10, 2012, Tikal contacted the company and asked if he could set up a $1 million dollar escrow account for use in financing future trans-Pacific and trans-Atlantic travel. On September 12, he signed a contract agreeing to deposit $1 million dollars with Jets.com. Tikal asked that the money be deposited via a wire transfer and provided Jets.com with an account and routing number. However, those numbers actually came back to the Atlanta Federal Reserve, and no deposit was ever made. While this episode is in one sense another attempted fraud by Tikal, it is also evidence of an attempt to establish a quick means to travel overseas.

///

///

///

///

///

///

///

///

///

///

///

///

///

**E.   Conclusion**

53. Based upon the information above, there is probable cause to believe that Alan Tikal has committed and continues to commit violations of Title 18, United States Code, Section 1341 (Mail Fraud). More specifically, he has devised and executed a scheme to defraud based upon the false premise that he would extinguish his clients' existing mortgage loan obligations. He has made material misrepresentations of fact, including but not limited to: the assertion that he is a registered private banker; the representation that he had access to large sums of money; and most fundamentally, the representation that he had the ability and/or the intent to pay his clients' mortgage debt obligations. He obtained client monies that he would not otherwise obtain as a result of these misrepresentations and he utilized the United States mail in furtherance of this scheme as set forth in paragraphs 44-47, above. By this affidavit and complaint, I request that the Court issue a warrant for Tikal's arrest.

_____
S.A. Joseph Camillucci
SIGTARP

Sworn to and subscribed before me
on this 27th day of September, 2012.

_____
Hon. Carolyn K. Delaney
United States Magistrate Judge

Approved as to Form:

_____
Philip A. Ferrari
Assistant U.S. Attorney