1  BENJAMIN B. WAGNER
   United States Attorney
2  PHILIP A. FERRARI
   Assistant United States Attorney
3  MAGGY KRELL
   Special Assistant United States Attorney
4  501 I Street, Suite 10-100
   Sacramento, CA 95814
5  Telephone: (916) 554-2700
   Facsimile: (916) 554-2900
6
   Attorneys for Plaintiff
7  United States of America

**FILED**

SEP 1 1 2014

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
              DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NO. 12-CR-0362 TLN |
|---|---|
| Plaintiff, | STIPULATION OF FACT BY THE DEFENDANT AND [~~PROPOSED~~] ORDER |
| v. | |
| ALAN DAVID TIKAL, | |
| Defendant, | |

I, Alan David Tikal, am the defendant in the above captioned case. I am aware of my absolute constitutional right to have each element of every charge brought against me proven by the government beyond a reasonable doubt. I am also aware of my right to be tried by a jury, to subpoena witnesses to testify on my behalf, to confront and cross-examine witnesses against me, and not to be compelled to incriminate myself. With full knowledge of my rights, and aware of the consequences that will result if I am convicted, I am voluntarily entering into this stipulation of fact.

I have read this stipulation and carefully reviewed every part of it. I understand it, and I am voluntarily entering into it. No one has threatened or forced me in any way to enter into this stipulation.

Stipulation of Fact and [Proposed] Order                   1



## I. THE CHARGES AGAINST ME

I am aware that I am charged in Counts Two through Twelve in the Superseding Indictment with mail fraud, in violation 18 U.S.C. § 1341. The government is required to prove the following elements beyond a reasonable doubt to establish a violation of this offense:

First, the defendant knowingly devised or knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;

Second, the statements made or facts omitted as part of the scheme were material, that is they would reasonably influence a person to part with money or property;

Third, the defendant acted with the intent to defraud; and

Fourth, the defendant caused, or participated in causing, the mails to be used to carry out an essential part of the scheme.

In addition, the Superseding Indictment charges that the mail fraud violation affected financial institutions. To prove this, the government would have to establish that the plan or scheme to defraud exposed a financial institution to a new or increased risk of loss or caused a financial institution to suffer an actual loss.

I am aware that I am charged in Count Thirteen in the Superseding Indictment with money laundering in violation of 18 U.S.C. § 1957. The government is required to prove the following elements beyond a reasonable doubt to establish a violation of this offense:

First, the defendant must knowingly engage or attempt to engage in a monetary transaction;

Second, the defendant must know that the transaction involved criminally derived property;

Third, the criminally derived property must be of a value greater than $10,000;

Fourth, the criminally derived property must also, in fact, have been derived from a specified unlawful activity; and

Fifth, the monetary transaction must have taken place in the United States.

Finally, I am aware that the government is required to prove that venue exists for each of the charged offenses. I am aware that the government is required to prove venue by a preponderance of the evidence. *United States v. Lukashov*, 694 F.3d 1107, 1120 (9th Cir. 2012).

Stipulation of Fact and [Proposed] Order         2         

## II. POTENTIAL CONSEQUENCES OF MY CONVICTION

I am aware that with respect to each count of mail fraud affecting a financial institution, the maximum sentence that the Court can impose is 30 years of incarceration, a fine of $1,000,000, a 5 year period of supervised release and a special assessment of $100. I am aware that with respect to the money laundering count, the maximum sentence that the Court can impose is 10 years of incarceration, a fine of $250,000 or twice the amount of criminally derived property involved in the transaction, a 3 year period of supervised release and a special assessment of $100. I am aware that if I violate a condition of supervised release during any term of supervised release, the Court may revoke the term of supervised release and require me to serve up to 3 additional years imprisonment.

I am aware that if I am convicted, the Court can order the payment of restitution for the full loss determined to be caused by my conduct. I am additionally aware that there are forfeiture allegations against me in the pending Superseding Indictment.

I am aware that in imposing any sentence, the Court must consult the Federal Sentencing Guidelines and must take them into account when determining a final sentence. I understand that the Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the Sentencing Guidelines and must take them into account when determining a final sentence. I further understand that the Court, after consultation and consideration of the Sentencing Guidelines, must impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

## III. STIPULATED FACTS

I agree that if this case proceeded to trial, the government would prove the following facts beyond a reasonable doubt.

1. Between January 7, 2010, and August 20, 2013, I resided in ~~the District of~~ Minnesota, ~~the District of~~ Nevada, ~~the Northern District of~~ California, and ~~the Eastern District of California~~. I was a principal of the KATN Trust, a purported revocable living trust, through which I operated my business, which was variously called a Banker Acceptance Program, Mortgage Debt Relief Program, and Homeowner Rehabilitation Program. KATN is an acronym for "Kicking Ass, Taking Names."

Stipulation of Fact and [Proposed] Order    3

2.    I and my associates convinced more than 1,000 homeowners to participate in a fraudulent residential mortgage relief program and to make payments to myself, my family and my associates totaling well over $3,400,000.00 in fees and "loan" payments. In reliance upon the misrepresentations made by myself and my associates, many of these homeowners stopped making payments on their existing mortgage loans and disregarded notices sent to them by their lending institutions. As a result, the financial institutions suffered losses, and many homeowners became delinquent on their loans and ultimately had their homes foreclosed upon.

3.    My program targeted distressed homeowners in ~~the Eastern District of~~ Sacramento, California and elsewhere who were typically experiencing difficulties making their existing monthly mortgage payments. Many did not speak English as their first language. We promised the homeowners their outstanding mortgage debt would be reduced by 75%. More specifically, the homeowners were promised that as a result of their participation in the mortgage relief program, their existing debt would be replaced with a new "loan" in an amount equaling 25% of their original obligation. These new "loans" would be owed to my business entity KATN. The homeowners were assured that if they participated in the mortgage relief program, the original lenders would have no way to foreclose on their properties.

4.    In promoting the mortgage relief program, I falsely claimed that I was a registered private banker with access to an enormous line of credit and the ability to pay off homeowners' mortgage debts in full. We further falsely claimed that the mortgage relief program had a tremendous record of past success in saving homeowners from foreclosure. In truth, we never made any payments to financial institutions on behalf of homeowners in satisfaction of their pre-existing mortgage debt obligations; the purported "loan" payments received from homeowners were simply divided amongst myself, my family and my associates for personal use; there was not a single instance in which a homeowner's debt was paid, forgiven or otherwise extinguished as a result of the mortgage relief program; and many of the homeowners' properties were foreclosed upon by the original lenders.

5.    Upon first entering the mortgage relief program, homeowners were required to provide an initial fee of approximately $1,000. Portions of these funds would then be transferred to

Stipulation of Fact and [Proposed] Order                4

accounts controlled and accessed by myself or my associates. Subsequently, fraudulent documents were executed and recorded in local County Recorder's offices. The new recordings included a "Substitution of Trustee and Full Reconveyance" deed, which purported to substitute myself as the "beneficiary / new trustee" for the legitimate mortgage holding financial institution, and "Deeds of Trust" that purportedly secured the distressed homeowners' new "loans." Among other things, these recordings served to make it difficult for financial institutions to foreclose on properties securing defaulted mortgage loans. When the documents were recorded, additional fees of approximately $1,000 or more were collected from the homeowners, referred to as "closing costs." Finally, the mortgage relief program collected "loan" payments from homeowners. Regardless of where the "loan" payments were originally directed, a large percentage of these deposits were continually transferred to accounts controlled and accessed by myself and my associates.

6. In the Summer of 2011, I signed and caused to be filed bankruptcy petitions in the United States Bankruptcy Court for the District of Nevada. One consequence of filing a bankruptcy petition is that creditors are temporarily prohibited from taking steps to recover debts from debtors. This prohibition, known as the "automatic stay," applies to actions such as property foreclosures. In these petitions, I claimed the original, legitimate home mortgage loans owed by each of the homeowners participating in the mortgage relief program as my liabilities, and the financial institutions that extended those mortgage loans as my creditors. We periodically filed amended schedules to the pending bankruptcy petition, adding the properties and loan obligations of new mortgage relief program participants. We also regularly opposed motions by the financial institutions seeking relief from the automatic stay. We utilized these bankruptcy filings to take advantage of the automatic stay and thereby postpone foreclosure actions by financial institutions on homeowner properties. Postponing the foreclosure actions allowed us to claim that the mortgage relief program was working, to attract new homeowners to participate in the mortgage relief program, and to encourage the homeowners to continue making payments to us rather than the financial institution.

7. On October 11, 2012, I was indicted in the pending case, and ordered detained pending trial. However, the mortgage relief program continued to operate at my direction, largely

Stipulation of Fact and [Proposed] Order      5

through the efforts of others involved. The bankruptcy proceeding continued, and new homeowner properties were periodically added to amended schedules. In addition, members of the scheme continued to oppose efforts by financial institutions to obtain relief from the automatic stay. Homeowner loan payments continued to be received and distributed amongst those participating in the scheme.

8. Throughout the life of the scheme, the homeowners would receive periodic correspondence from myself and my associates, updating them on the progress of the program, and encouraging them to continue making their monthly "loan" payments. Often this correspondence was sent through the United States mail.

9. If called to testify as a witness, C.T. would testify that she participated in the program because she listened to webinars describing it and learned that she would only owe 25% of her previous loan, that she would not have to deal with her prior bank anymore, and that the program worked. Evidence would be presented that she paid a total of at least $9,935.54 in fees and monthly payments. She would testify that ultimately, she learned the program did not work, and that her original lender still owned the loan on her house. In addition, C.T. would testify that the following mailings were sent to or from her home in Sacramento, California, in connection with her participation in the program. On or about February 3, 2011, she received a letter sent from Las Vegas advising her of a change in where to send her monthly payments. On or about May 18, 2011, she received a letter from Las Vegas concerning the bankruptcy filing, and attaching a letter from an attorney requesting her monthly payments. On or about September 6, 2012, she received a letter from Las Vegas concerning the servicing of her "loan." And on or about February 8, 2013, she sent a package of documents, including a fraudulent check created by associates of the program, from her home in Sacramento to ~~Tamara Tikal~~ an unnamed conspirator [AT] in Pittsburg, California.

10. If called to testify as a witness, L.R. and H.R., a married couple, would testify that they participated in the program with respect to a number of properties, including their home in Vallejo, California. They would testify they participated because of their belief that their existing loans would be replaced by new loans totaling only 25% of what they previously owed. Evidence would be presented that they paid a total of at least $7,874.98 in fees and monthly payments.

Evidence would be presented on or about November 1, 2010, they received a welcome letter re: their KATN loan together with payment coupons at their home in Vallejo. Evidence would also be presented that on or about June 14, 2012, they received a letter updating them on the progress of the program and requesting payments at their home in Vallejo.

11. Witness N.M. would testify that she participated in the program. Evidence would be presented that she paid a total of at least $608.38 in fees and monthly payments. Evidence would also be presented that on or about June 15, 2011, she received a letter from Las Vegas at her home in Stockton, California, which included an update on the bankruptcy proceeding and which requested continuing payments.

12. Witnesses A.E. and A.M. would testify that they participated in the program and evidence would establish that they paid a total of at least $16,122.98 and $2,700.00 in fees and monthly payments, respectively. Evidence would also be presented that on or about June 14, 2012, A.M in Riverbank, California, and A.E. in Modesto, California, received the same letter from Las Vegas updating them on the program and requesting continued payment.

13. Witness A.C. would testify that she participated in the program with respect to her home in Fresno, California. Evidence would be presented that she paid a total of at least $12,275.28 in fees and monthly payments. In addition, evidence would be presented that on or about April 15, 2013, she mailed her monthly loan payment from Fresno to Pittsburg, California. On or about August 20, 2013, she received in the mail from Las Vegas a set of payment coupons re: her KATN loan at her home in Fresno.

14. In addition, the government would be able to prove that on or about October 5, 2010, I withdrew $10,750 in cash from an account I controlled in the name of the KATN Revocable Living Trust (Checking Account No. xxxxxx0304) at Wells Fargo Bank in Rogers, Minnesota. The previous day, October 4, 2010, at my direction, an associate involved in the mortgage relief program transferred a total of $23,975 in homeowner payments from an account in Stockton, California (JP Morgan Chase Checking Account No. xxxxx9911) to my account.

15. In all, the government would be able to prove that from January of 2010, through August of 2013, more than $5,800,000 in fees and monthly payments was paid by homeowners in

1  the program to the defendant and his associates. Of those funds, the government would be able to
2  prove that more than $2,500,000 was paid into accounts controlled by Tikal ~~and/or his family~~. A̅

3  16. Many of the financial institutions owning the true and actual loans on the
4  homeowners' properties were FDIC-insured, and many of them sustained actual losses, both in the
5  form of foregone participant loan payments, legal fees to lift the automatic stay and clear clouded
6  titles, and in foreclosing on defaulted properties.

8  Dated: 11 SEPT 14

_____
ALAN DAVID TIKAL

## ORDER

The Court finds that defendant Alan David Tikal's has knowingly and voluntarily entered into the foregoing stipulation of facts, and that the stipulation is supported by a basis in fact. Accordingly, it is hereby ordered that the foregoing stipulation of fact is accepted and shall be entered on the Court's docket.

Dated: 9/11/14

_____
TROY L. NUNLEY
United States District Judge

Stipulation of Fact and [Proposed] Order                 8