UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Respondent,<br><br>　　v.<br><br>ALAN DAVID TIKAL,<br><br>　　　　　Movant. | No. 2: 12-cr-0362 TLN KJN P<br><br>ORDER AND FINDINGS AND RECOMMENDATIONS |

I. Introduction

Movant is a federal prisoner, proceeding without counsel, with a motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255. (ECF No. 284.) Movant challenges his 2014 convictions for mail fraud affecting a financial institution in violation of 18 U.S.C. § 1341 (counts 2-12) and money laundering in violation of 18 U.S.C. § 1957 (count 13.) Movant is serving a sentence of 288 months.

Movant raises three claims. First, movant argues a lack of venue. (ECF No. 284 at 2.) Second, movant argues that the government failed to prove exclusive or concurrent jurisdiction. (Id. at 3.) Third, movant argues that his activities were lawful, citing Jesinoski v. Countrywide, 135 S. Ct. 790 (2015). (Id.) For the reasons stated herein, the undersigned recommends that movant's motion be denied.

////

II. Background of Movant's Conviction

On September 11, 2014, movant entered a waiver of the right to a jury trial and a stipulation of facts concerning his case. (ECF Nos. 140, 141, 143.) The bench trial occurred on September 15, 2014. (ECF No. 149.) The government relied on a stipulation of fact and a stipulation regarding the mailing of various documents. The stipulation of fact provided, in relevant part, as follows:

> 1. Between January 7, 2010 and August 20, 2013, I resided in Minnesota, Nevada, California. I was a principal of the KATN Trust, a purported revocable living trust, through which I operated my business, which was variously called a Banker Acceptance Program, Mortgage Debt Relief Program, and Homeowner Rehabilitation Program. KATN is an acronym for "Kicking Ass, Taking Names."
>
> 2. I and my associates convinced more than 1,000 homeowners to participate in a fraudulent residential mortgage relief program and to make payments to myself, my family and my associates totaling well over $3,400,000.00 in fees and "loan" payments. In reliance upon the misrepresentations made by myself and my associates, many of these homeowners stopped making payments on their existing mortgage loans and disregarded notices sent to them by their lending institutions. As a result, the financial institutions suffered losses, and many homeowners became delinquent on their loans and ultimately had their homes foreclosed upon.
>
> 3. My program targeted distressed homeowners in Sacramento, California and elsewhere who were typically experiencing difficulties making their existing monthly mortgage payments. Many did not speak English as their first language. We promised the homeowners their outstanding mortgage debt would be reduced by 75%. More specifically, the homeowners were promised that as a result of their participation in the mortgage relief program, their existing debt would be replaced with a new "loan" in an amount equaling 25% of their original obligation. These new "loans" would be owed to my business entity KATN. The homeowners were assured that if they participated in the mortgage relief program, the original lenders would have no way to foreclose on their properties.
>
> 4. In promoting the mortgage relief program, I falsely claimed that I was a registered private banker with access to an enormous line of credit and the ability to pay off homeowners' mortgage debts in full. We further falsely claimed that the mortgage relief program had a tremendous record of past success in saving homeowners from foreclosure. In truth, we never made any payments to financial institutions on behalf of homeowners in satisfaction of their pre-existing mortgage debt obligations; the purported "loan" payments received from homeowners were simply divided amongst myself, my family and my associates for personal use; there was

not a single instance in which a homeowner's debt was paid, forgiven or otherwise extinguished as a result of the mortgage relief program; and many of the homeowners' properties were foreclosed upon by the original lenders.

5. Upon first entering the mortgage relief program, homeowners were required to provide an additional fee of approximately $1000. Portions of these funds would then be transferred to accounts controlled and accessed by myself or my associates. Subsequently, fraudulent documents were executed and recorded in local County Recorder's offices. The new recordings included a "Substitution of Trustee and Full Reconveyance" deed, which purported to substitute myself as the "beneficiary/new trustee" for the legitimate mortgage holding financial institution, and "Deeds of Trust" that purportedly secured the distressed homeowners' new "loans." Among other things, these recordings served to make it difficult for financial institutions to foreclose on properties securing defaulted mortgage loans. When the documents were recorded, additional fees of approximately $1,000 or more were collected from the homeowner, referred to as "closing costs." Finally, the mortgage relief program collected "loan" payments from homeowners. Regardless of where the "loan" payments were originally directed, a large percentage of these deposits were continually transferred to accounts controlled and accessed by myself and by associates.

6. In the Summer of 2011, I signed and caused to be filed bankruptcy petitions in the United States Bankruptcy Court for the District of Nevada. One consequence of filing a bankruptcy petition is that creditors are temporarily prohibited from taking steps to recover debts from debtors. This prohibition, known as the "automatic stay," applies to actions such as property foreclosures. In these petitions, I claimed the original, legitimate home mortgage loans owed by each of the homeowners participating in the mortgage relief program as my liabilities, and the financial institutions that extended these mortgage loans as my creditors. We periodically filed amended schedules to the pending bankruptcy petition, adding the properties and loan obligations of new mortgage relief program participants. We also regularly opposed motions by the financial institutions seeking relief from the automatic stay. We utilized these bankruptcy filings to take advantage of the automatic stay and thereby postpone foreclose actions by financial institutions on homeowner properties. Postponing the foreclose actions allowed us to claim that the mortgage relief program was working, to attract new homeowners to participate in the mortgage relief program, and to encourage the homeowners to continue making payments to us rather than the financial institution.

7. On October 11, 2012, I was indicted in the pending case, and ordered detained pending trial. However, the mortgage relief program continued to operate at my direction, largely through the efforts of others involved. The bankruptcy proceeding continued, and new homeowner properties were periodically added to amended schedules. In addition, members of the scheme continued to oppose efforts by financial institutions to obtain relief from the

3

automatic stay. Homeowner loan payments continued to be received and distributed amongst those participating in the scheme.

8. Throughout the life of the scheme, the homeowners would receive periodic correspondence from myself and my associates updating them on the progress of the program, and encouraging them to continue making their monthly "loan" payments. Often this correspondence was sent through the United States mail.

9. If called to testify as a witness, C.T. would testify that she participated in the program because she listened to webinars describing it and learned that she would owe only 25% of her previous loan, that she would not have to deal with her prior bank anymore, and that the program worked. Evidence would be presented that she paid a total of at least $9,935.54 in fees and monthly payments. She would testify that ultimately, she learned the program did not work, and that her original lender still owned the loan to her house. In addition, C.T. would testify that the following mails were sent to or from her home in Sacramento, California, in connections with her participation in the program. On or about February 3, 2011, she received a letter sent from Las Vegas advising her of a change in where to send her monthly payments. On or about May 8, 2011, she received a letter from Las Vegas concerning the bankruptcy filing, and attaching a letter from an attorney requesting her monthly payments. On or about September 6, 2012, she received a letter from Las Vegas concerning the servicing of her "loan." And on or about February 8, 2013, she sent a package of documents, including a fraudulent check created by associates of the program, from her home in Sacramento to an unnamed conspirator in Pittsburg, California.

10. If called to testify as a witness, L.R. and H.R. a married couple, would testify that they participated in the program with respect to a number of properties, including their home in Vallejo, California. They would testify they participated because of their belief that their existing loans would be replaced by new loans totaling only 25% of what they previously owed. Evidence would be presented that they paid a total of at least $7,874.98 in fees and monthly payments. Evidence would be presented on or about November 1, 2010, they received a welcome letter re: their KATN loan together with payment coupons at their home in Vallejo. Evidence would also be presented that on or about June 14, 2012, they received a letter updating them on the progress of the program and requesting payments at their home in Vallejo.

11. Witness N.M. would testify that she participated in the program. Evidence would be presented that she paid a total of at least $608.38 in fees and monthly payments. Evidence would also be presented that on or about June 15, 2011, she received a letter from Las Vegas at her home in Stockton, California, which included an update on the bankruptcy proceeding and which requested continuing payments.

12. Witnesses A.E. and A.M. would testify that they participated in the program and evidence would establish that they paid a total of

4

at least $16,122.98 and $2,700.00 in fees and monthly payments, respectively. Evidence would also be presented that on or about June 14, 2012, A.M. in Riverbank, California, and A.E. in Modesto, California received the same letter from Las Vegas updating them on the program and requesting continued payment.

13. Witness A.C. would testify that she participated in the program with respect to her home in Fresno, California. Evidence would be presented that she paid a total of at least $12,275.28 in fees and monthly payments. In addition, evidence would be presented that on or about April 15, 2013, she mailed her monthly loan payment from Fresno to Pittsburg, California. On or about August 20, 2013, she received in the mail from Las Vegas a set of payment coupons re: her KATN loan at her home in Fresno.

14. In addition, the government would be able to prove that on or about October 5, 2010, I withdrew $10,750 in cash from an account I controlled in the name of the KATN Revocable Living Trust (Checking Account No. xxxxxx0304) at Wells Fargo Bank in Rogers, Minnesota. The previous day, October 4, 2010, at my direction, an associate involved in the mortgage relief program transferred a total of $23,975 in homeowner payments from an account in Stockton, California (JP Morgan Chase Checking Account No. xxxxx9911) to my account.

15. In all, the government would be able to prove that from January of 2010, through August of 2013, more than $5,800,000 in fees and monthly payments was paid by homeowners in the program to the defendant and his associates. Of those funds, the government would be able to prove that more than $2,500,000 was paid into accounts controlled by Tikal.

16. Many of the financial institutions owning the true and actual loans on the homeowners' properties were FDIC-insured, and many of them sustained actual losses, both in the form of foregone participant loan payments, legal fees to lift the automatic stay and clear clouded titles, and in foreclosing on defaulted properties.

(ECF No. 140 at 3-8.)

At the conclusion of the bench trial, the District Court found movant guilty on counts two through thirteen.

III. Discussion

In the opposition to the pending motion, respondent argues that the motion should be denied because movant raised the claims raised in the instant motion on appeal. The background to this argument is set forth herein.

////

A. <u>Background</u>

Following his conviction, movant filed a notice of appeal. (ECF Nos. 224, 225.) On March 26, 2015, movant filed a motion to represent himself on appeal. (ECF No. 297-5 at 4 (no. 3).) On June 2, 2015, the Ninth Circuit denied this request and ordered the appointment of counsel. (<u>Id.</u> at 4 (no. 20).) On October 23, 2015, appointed counsel submitted an <u>Anders</u>[1] brief and moved to withdraw as counsel. (<u>Id.</u> at 6 (no. 40.)

The <u>Anders</u> brief stated, in relevant part, "After fully reviewing the record, counsel has been unable to identify any non-frivolous issues to be raised on this appeal. Counsel therefore requests this Court to independently review the record in accord with <u>Anders v. California</u>." (ECF No. 297-6 at 15.) In the <u>Anders</u> brief, counsel also stated that he had identified the following possible issue for review: did the government fail to prove that venue was proper in the Eastern District of California? (<u>Id.</u> at 15-16.) In the briefing regarding this issue, counsel stated that movant had repeatedly asserted that the government had failed to prove that venue was proper in the Eastern District. (<u>Id.</u> at 16.) Counsel cited 18 U.S.C. § 3237(a) which provides that "[a]ny offense involving the use of the mails ….is a continuing offense and …may be … prosecuted in any district from, through, or into which such … mail matter … moves." (<u>Id.</u>) Counsel acknowledged that in the stipulation of facts movant entered into for trial, movant agreed that various mailings from his loan program were received in cities located in the Eastern District. (<u>Id.</u>)

On November 9, 2015, the Ninth Circuit issued an order indicating that it would conduct an independent review of the record, and also permitting the filing of a pro se brief previously submitted by movant. (ECF No. 297-5 at 7 (no. 47).) In this pro se brief, movant raised the same three issues raised in the instant motion, as well as other claims. (ECF No. 297-7.)

On February 29, 2016, the Ninth Circuit issued an order finding no arguable grounds for relief on direct appeal. (ECF No. 297-8.) The Ninth Circuit order acknowledged the <u>Anders</u> brief as well as movant's pro se supplemental opening brief. (<u>Id.</u> at 3.)

---

[1] <u>Anders v. California</u>, 366 U.S. 738 (1967).

B. Claims Raised on Appeal

Respondent argues that movant's claims are barred because they were rejected by the Ninth Circuit on appeal.

Claims previously raised on appeal "cannot be the basis of a § 2255 motion." United States v. Redd, 759 F.2d 699, 701 (9th Cir. 1985); United States v. Currie, 589 F.2d 993, 995 (9th Cir. 1979) ("[i]ssues disposed of on a previous direct appeal are not reviewable in a subsequent § 2255 proceeding" and "the fact that the issue may be stated in different terms is of no significance").

Movant's clams are barred because they were raised on direct appeal. The Ninth Circuit found that these claims were without merit. On this ground, movant's motion should be denied.

C. Merits

In an abundance of caution, respondent has addressed the merits of movant's claim. The undersigned will likewise, in an abundance of caution, briefly address the merits of movant's claims. For the reasons stated herein, these claims are without merit.

*Venue*

Movant argues that there was no proof of venue. "[A] defendant in a criminal case has a constitutional right to be tried in a district where the crime was committed." United States v. Lukashov, 694 F.3d 1107, 1119 (9th Cir. 2012) (citing U.S. Const. art. III, § 2, cl. 3). It is the government's burden to establish proper venue by a preponderance of the evidence. See United States v. Chi Tong Kuok, 671 F.3d 931, 937 (9th Cir. 2012).

With respect to mail fraud, "[a]ny offense involving the use of the mails … may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves." 18 U.S.C. § 3237(a). As noted by respondent, movant stipulated that some of the mailings were sent to or from a location within the Eastern District of California. For example, movant stipulated that victim C.T. received mail from movant at her home in Sacramento, California, which is located in the Eastern District.

////
////

7

With respect to money laundering, a charge under 18 U.S.C. § 1957 may be brought in:

> (A) any district in which the financial or monetary transaction is conducted; or
>
> (B) any district where a prosecution for the underlying specified unlawful activity could be brought, if the defendant participated in the transfer of the proceeds of the specified unlawful activity from that district to the district where the financial or monetary transaction is conducted.

18 U.S.C. § 1956(i)(l).

Movant stipulated that he transferred a total of $23,975 in homeowner payments from an account in Stockton, California (JP Morgan Chase Checking Account No. xxxxx9911) to his account in Minnesota. Stockton, California is located in the Eastern District.

For the reasons discussed above, movant's claim alleging that venue was improper is without merit.

*Jurisdiction*

Movant argues that the government failed to prove exclusive or concurrent jurisdiction. As observed by respondent, "the district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, against all offenses under the laws of the United States." 18 U.S.C. § 3231. Movant's argument that there was no jurisdiction for his prosecution is without merit.

*Jesinoski v. Countrywide*

Movant argues that his mortgage rescission activities were lawful, citing Jesinoski v. Countrywide, 135 S.Ct. 790 (2015).[2] As noted by respondent in the answer, one of the goals of rescission is to return the parties "most nearly to the position they held prior to entering into the transaction." Merritt v. Countrywide Financial Corporation, 759 F.3d 1023, 1030 (9th Cir. 2014). Movant promised his victims that they could stay in their homes with greatly reduced loan payment obligations. In other words, movant did not agree to return the victims to the position

---

[2] In Jesinoski, the Supreme Court held that a borrower need only provide written notice to the lender within three years of the date the transaction was consummated, not file suit within that three year period, in order to exercise the right to rescind the loan under the Truth in Lending Act ("TILA").

8

they held prior to entering the transaction. This claim is without merit.

D. Default

In a footnote, respondent argues that to the extent this court finds that movant's claims were not raised on direct appeal, the claims are procedurally defaulted. A motion under 28 U.S.C. § 2255 may be denied as defaulted if the claim presented in the motion was not raised on direct appeal. Massaro v. United States, 538 U.S. 500, 504 (2003); see also United States v. Johnson, 988 F.2d 941, 945 (9th Cir. 1993) ("Section 2255, however, is not designed to provide criminal defendants multiple opportunities to challenge their sentence …").

A defendant may overcome procedural default by showing "cause and prejudice." Id. Cause "must be something external to the petitioner, something that cannot be fairly attributed to him." Coleman v. Thompson, 501 U.S. 722, 753 (1991). To establish prejudice, the petitioner bears the burden of proving the alleged errors "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimension." United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original).

Were the undersigned to have found that movant failed to raise his claims on direct appeal, the claims would be defaulted. The undersigned would also find that movant did not demonstrate prejudice to overcome the default because, for the reasons discussed above, movant did not demonstrate that the alleged errors infected his trial with error of constitutional dimension.

IV. Remaining Matters

Movant has filed several motions during the pendency of this § 2255 motion. These motions are addressed herein.

Movant filed a motion to proceed in forma pauperis in support of his § 2255 motion. (ECF No. 285.) A motion under § 2255 is filed as part of the underlying criminal prosecution, and therefore does not require payment of a filing fee as does a petition for a writ of habeas corpus. See 28 U.S.C. § 2255. Because movant was not required to pay any fees to file this motion, there is no need for movant to proceed in forma pauperis. Accordingly, the motion to proceed in forma pauperis is denied as unnecessary.

////

Movant filed a motion for discovery in support of the pending § 2255 motion. (ECF No. 286.) Movant requests rescission records for the victims in this case. (Id.) Because movant's § 2255 motion should be denied on grounds that movant raised his claims on appeal, the motion for discovery is denied. Moreover, based on the discussion above, the undersigned also finds that the victims' rescission records are not relevant to the merits of movant's claims.

Movant filed a motion requesting that he be provided with a complete trial transcript at the government's expense. (ECF No. 290.) The United States Supreme Court has held that there is no absolute constitutional right to a free copy of the record on collateral review. United States v. MacCollum, 426 U.S. 317 (1976) (interpreting 28 U.S.C. § 753(f) and applying to § 2255 habeas petition). In order to obtain free copies of trial records, the court must certify that the petition is "not frivolous" and the transcript is "needed to decide the issue." Id. at 321.

Because movant's claims have been denied on appeal and are without merit, the transcript is not needed to decide the issues raised in this motion. Accordingly, movant's motion for a free transcript is denied.

Movant filed a motion for injunctive relief. (ECF No. 293.) In this motion, movant requests a court order prohibiting prison officials from transferring him during the pendency of this § 2255 motion. Movant alleges that he fears retaliation from prison staff for filing this action.

Movant's allegation that prison officials may engage in retaliatory action is speculative and unsupported by any specific facts. Accordingly, movant's motion for injunctive relief is denied.

Movant filed a motion for a certificate of appealability. (ECF No. 299.) This request is premature because it was filed before the court addressed the merits of movant's motion. Movant may file a request for a certificate of appealabilty in response to these findings and recommendations identifying the issue(s) as to which he seeks the certificate of appealabilty.

Movant filed a motion for findings of fact and conclusions of law. (ECF No. 300.) Movant requests that the court issue findings of fact and conclusions of law that the Ninth Circuit did not find that there were "no arguable grounds for relief on direct appeal," as claimed by respondent.

As discussed above, in the order affirming movant's conviction, the Ninth Circuit found that, "[o]ur independent review of the record pursuant to Penson v. Ohio, 488 U.S. 75, 80 (1988), discloses no arguable grounds for relief on direct appeal." (ECF No. 281 at 2.) Movant's motion for a finding of fact and conclusion of law to the contrary is denied.

Movant filed a motion for sanctions against the government for failing to provide him with key portions of the transcript. (ECF No. 301.) Movant cites the order of August 19, 2016 by the undersigned (ECF No. 294) directing respondent to file a response to movant's § 2255 motion. In this order, the undersigned directed respondent to file with the response "any and all transcripts or other documents relevant to the determination of the issues resented in the motion." (Id. at 1.) The undersigned finds that respondent's opposition to the motion includes all relevant documents. Accordingly, movant's motion for sanctions is denied.

Movant filed a motion requesting the dismissal of all pending warrants and charges for lack of proof. (ECF No. 304.) Movant also alleges a violation of his right to a speedy trial. (Id.) Movant has no charges pending against him in this criminal case. Accordingly, movant's motion for dismissal of all pending charges is denied.

Movant filed a motion to dismiss for lack of jurisdiction pursuant to 40 U.S.C. § 3112(c). (ECF No. 305.) Title 40 U.S.C. § 3112 addresses when the Federal Government obtains jurisdiction over land or an interest in land it acquires. This section is not relevant to movant's conviction. Accordingly, movant's motion to dismiss for lack of jurisdiction pursuant to 40 U.S.C. § 3112(c) is denied.

Movant filed a motion for issuance of an order to show cause. (ECF No. 306.) Movant argues that the government failed to prove venue. As discussed above, this claim was raised and rejected on appeal. In addition, this claim is without merit for the reasons discussed above. Accordingly, the motion for an order to show cause is denied.

Accordingly, IT IS HEREBY ORDERED that:

1. Movant's motion to proceed in forma pauperis (ECF No. 285) is denied;

2. Movant's motion for discovery (ECF No. 286) is denied;

3. Movant's motion for transcripts (ECF No. 290) is denied;

4. Movant's motion for an injunction (ECF No. 293) is denied;

5. Movant's motion for a certificate of appealability (ECF No. 299) is denied;

6. Movant's motion for findings of fact (ECF No. 300) is denied;

7. Movant's motion for sanctions (ECF No. 301) is denied;

8. Movant's motion for dismissal of pending charges (ECF No. 304) is denied;

9. Movant's motion to dismiss and for sanctions (ECF No. 305) is denied;

10. Movant's motion for issuance of an order to show cause (ECF No. 306) is denied;

IT IS HEREBY RECOMMENDED that:

1. Movant's August 4, 2016 motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF No. 284) be denied;

2. The Clerk of the Court be directed to close the companion civil case No. 2: 16-cv-1851.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If movant files objections, he shall also address whether a certificate of appealability should issue and, if so, why and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: May 2, 2017

_____
KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

Tik362.247